Good morning, Your Honors. My name is Ward Talliff. I appear today on behalf of Lynn Diola, Brian Miller, and the Morrison Law Firm. Also appearing with me is Timothy Strauch, my co-counsel, and my client, one of my clients, Lynn Diola. And at the counsel table also is Max Davis, who represents co-appellant Michael Lane. You know, I have known Judge Lovell for more than 50 years. And I have tremendous admiration and respect for him. But in this particular case, what he did was something that on a daily basis as lawyers and judges, we ask jurors not to do, which is, don't make up your mind until you've heard all of the facts based on the issues that are fully explored. And each party has had an opportunity to present its evidence to you. And only then should you make a decision. Here, what Judge Lovell did was to render three sanctions orders without disclosing that he was going to use evidence that was not in the record before him, that was based on conduct that was pre-litigation conduct, and that was based on a disciplinary matter that he didn't say he was going to address. As a result of that approach, together with using the wrong standard, not clear and convincing evidence, we contend that those sanction orders are in error and should be reversed. And the factual basis on which the reversal should be made would be shown had my clients had an opportunity to present that at a hearing. For example, one of the grounds that Judge Lovell relied on in imposing the most severe sanction, using both 1927 and inherent power authority, was based on a supposed conflict that he perceived on the part of my client. Had there been a hearing at which my client had noticed that that was one of the judge's concerns, we would have been able to present evidence that, first of all, there was no conflict, certainly not in 2011, because- Of a claim against the insurance company. They paid out the entire coverage amount, right? They paid out $4 million under two policies, yes, Your Honor. You know, I ask one thing, and you answer something else. I'm sorry. The point of the lawsuit was a bad faith lawsuit. They paid out the full coverage amount. I don't need a specific figure. You dispute that? I agree. They paid out everything, right? They did. So what's- I don't understand it. I think that this was also nonplussed by why sue the insurance company when they have done everything they can do. They paid up every penny that they could under the policy. The basis of the policy was their violation of the Fair Trade Practices Act, or the Unfair Settlement Practices Act. Yes. They had an obligation in 2011, when Billy Redding was the only claimant, to investigate the claim, to settle it if they could reasonably and promptly, and to explain why they weren't going to pay if they weren't. And they didn't do those things until 2012. So the basis of the lawsuit was the activity- The client then went and got some other clients who then shared in the settlement amount. I'm sorry, I didn't hear the first part of that. So your client went out, who's a lawyer, went out and got some other clients who shared in the settlement amount. I mean, it's not like they paid out any less or more than they would have. Insurance company paid out everything it owed. Correct. What prejudice did the client suffer from that? It would have been the difference of whatever she was able to prove her damages in the bad faith suit, versus what she actually collected in 2012. So where's the bad faith? Bad faith is in failing to comply with the requirements of the Practices Act in 2011. There were four different elements for the bad faith claim. One was the failure to investigate. One was the failure to respond to an offer in a timely manner. And a third was to not explain the basis for refusing to pay in 2011. It was only this- Excuse me. Well, I think I'm helping to proceed with the questions. My understanding of District Judge's order is that he's sanctioning only for continuation of litigation after it was apparent that the bad faith lawsuit was going to fail. Is that right? That is correct, Your Honor. So how clear was it that the lawsuit was going to fail at the time from which the judge begins to run the sanctions? Well, the judge made his decision based on the claim of one witness that said, I wouldn't have settled in February of 2014. And the fact is that under the act, the insured's willingness to settle or consent or not is immaterial to the insurer's good faith obligation to investigate, promptly pay, or at least promptly explain why they weren't going to honor the claim. And here New York Marine didn't do that. So when was the $4 million payment made? In July of 2012. And when was the first claim made against the insurance company? In 2010. And when were the subsequent claims made? That's to say, firstly, it was a claim by the one person. That's correct, Ms. Redding. Right, Redding claim. And then there was the claims by, I think, five more people. And when were those claims made? They were filed at various times in 2012. Some were actual lawsuits, others were simply claims. You know, I see a lot of insurance cases. I see a lot more tardy payments than these. I have trouble seeing that this is a very viable bad faith case. Well, I can't stand here, Your Honor, and say, did I think it was a... And the prejudice suffered this by your own client who went out and got these other claimants. Well, that assumes that the client didn't agree, Your Honor. And the proof would have been the clients did agree. And it wasn't Ms. Diola who decided how to allocate these funds unilaterally. Now, I started to say, would I have brought this as a bad faith suit? Probably not. But there is a reasonable ground to believe under Montana law that there was a bad faith suit here. But at some point during the litigation in front of Judge LaValle, he says, sorry, this case isn't any good. He did that. And the case continues to be litigated. And it's only in the continuation that he says, I'm now going to assess sanctions. That part is true. But he based it on a statement that someone wouldn't have given consent. And consent isn't a defense to the insurer's obligation to investigate and settle, which should have been done in 2011. That was the basis of the lawsuit. And it was always a viable basis under Montana law. Why can't pre-litigation conduct be used as part of the judge's order on sanctions? What is the reason it cannot be used? It's the pre-litigation conduct related to the underlying litigation before this, the bad faith claim was brought, correct? In part, yes. He referred to that, Your Honor. I think the answer is simply because that's the law. The case law says that under inherent power, you can't use pre-litigation conduct. And under 1927, it's only conduct during the course of the litigation and doesn't even apply to the initial filing, the initial pleading. So it's limited to bad faith in this particular litigation. And whether it ultimately turned out to be a case that somebody thought had great merit or little merit, it wasn't done maliciously. It wasn't done in bad faith. And it was done under a fervent belief that this insurance company had not done what they were required to do legally in 2011. So he used an absolute under the Paris v. Safeco case which says that consent is immaterial to the insurer's duty. He relied on that theory to impose the sanction from that day forward. And he did it as if, and it was a statement by a gentleman named Gary Carlson, he did it as if that statement was uncontested and it was hotly disputed. There was evidence in the form of letters from the insurance companies hired lawyers for, is he? The district judge believes him. I'm sorry? Why does it have to be uncontested? Why isn't it enough that the district judge believes him? Well, if we would have known that was going to be the basis for the judge's ruling, again, we would have, and had the opportunity to be heard on it, we could have brought in some of the evidence. But if he simply says, I believe one person's statement, that cannot comply with the clear and convincing evidence standard. More than that. Okay. I'm sorry, you need two witnesses? Is this like treason? Well, if you're going to deal with a subjective test, which is the test here, I think you have to have witnesses. You have to be able to at least ask the lawyer what's in her mind or his mind when they were doing this. And that never occurred. He also imposed these sanctions in large part because he said he focused on what he perceived to be an ethical violation by Ms. Deola unlawfully distributing these trust fund monies. When if there was a hearing, that we would have been able to show that wasn't the case at all. But more importantly, we had no idea that that was going to be the focus of his sanctions ruling because in his first order, what he said is, at the end, I may refer this to disciplinary authorities. We had no idea that he was not only going to do that, but that he was actually going to base his decision on this misperception of what happened in relation to the distribution of those funds. And he did refer them to the disciplinary authorities. In fact, my client self-reported before that ever happened. I'm not sure it's relevant to the dispute in front of us. What happened with respect to the disciplinary proceedings? They're still pending, Your Honor, but they do not, if I can say this, the charges or the complaint does not allege anything to do with violating the trust account obligations or conflicts of interest. It has, I'm sorry, it does have to do solely with conflict of interest issue. Okay. Okay. But the short answer is, those are unresolved. Those are unresolved. I can state that there's been a complaint and an answer filed. There's no scheduling order yet. That's the status, okay. He also imposed these sanctions based on what he called a misstatement because Ms. Deola said at a hearing on a Rule 12c motion for judgment on the pleadings, that she believed there would be testimony from her clients or from other witnesses that the insurance company wanted to pay full policy limits in March or February of 2011. What I think that gets down to is the distinction between wanting to pay full policy limits or within policy limits. But that is not reckless. It might be a misstatement, but it's not done recklessly, which again is the standard. Your Honors, I wanted to allow Mr. Davis to have five minutes of my time, and I'd like to save what is now about two and a half minutes for rebuttal, if I may. Thank you. Thank you. And as the file reflects, I represent Richard Mike Lane, who was Ms. Deola's co-counsel in the federal court case and also initiated the original case on behalf of Ms. Redding against Anderson's Remulant. I want to pick up though on, first of all, note that the sanctions as entered against my client rest on Judge Lovell asking a number of questions that he never answers, rhetorical questions in the $515,000 sanction order. And given the requirement, I think that we agree on, that there needs to be a finding of subjective bad faith, asking a bunch of rhetorical questions that you don't bother, that the court doesn't bother to answer, strikes me as an insufficient basis to impose sanctions on my client. Beyond that, I endorse everything that Mr. Taloff has said on behalf of Ms. Deola. He doesn't answer, you mean the district judge doesn't answer? Correct. He asks, if you look at his- Rhetorical questions usually imply an answer. Well, he doesn't answer them. And I'll stand on his order, Judge Kuczynski. He poses questions and he does not, there are six rhetorical questions in that order, which he does not answer. Well, I understand that, but did you hear what I said? I heard what you said, but I disagree that that, if we're talking about sanctioning a lawyer for $500,000, I disagree that the idea that requires some kind of, whether it's clear and convincing, or simply a burden of proof, that there's subjective bad faith on behalf of my client. I think it requires something more than asking the questions rhetorically and not answering them. So I do disagree with you, sir, that that's sufficient under the standards under either 1927 or the court's inherent power, given the severity and the weight of what Judge Lovell did to my client in this case of sanctioning him for $515,000. If he said yes, after every one of the rhetorical questions, I would be different? If he did and explained it and gave it an opportunity. Also, I mean, something else we addressed was an opportunity to be heard on these matters. And they weren't really given an opportunity to be heard and explain those matters. But I want to go back in my limited time to talk about something Mr. Taloff talked about and Judge Fletcher, you hinted at, and I think Judge Kuczynski too, that there is what's so bad here about an insurance company taking time. What happened here is that the judge, the New York Marine reformulated the issues and the issue became, would they have ever paid $2 million to settle Ms. Redding's claim? But that wasn't the legal standard. The legal standard, as Mr. Taloff said, was that they had to make an effort to under section 3318, 201 subsection six, attempt in good faith to effectuate a prompt, fair, and equitable settlement of claims in which liability has become reasonably clear. In February of 2011, Mr. Lane made a $2 million policy limits demand. That's undisputed. There was a mediation. New York Marine came with $750,000 of authority, offered 250. Yet the question became, should they have paid $2 million? Many cases, you've seen lots of insurance cases, so have I, cases settle sometimes in between. And so the question becomes, was it so clear that in offering $250,000 in March of 2011, New York Marine satisfied its legal requirements under Montana law? Not whether they should have paid $2 million in hindsight, but whether doing that, in and of itself, satisfied those obligations. And if you say, if what I think the correct analysis is, no, that's reasonable minds could differ. Is it a million dollar case? I don't know. Would I have brought the case, as Mr. Tal says, I probably wouldn't have brought the case. But can you say categorically that that case, the bad faith case predicated. There's a Montana case where the insurance company eventually pays entire policy limits where they've been held to be in bad faith because they didn't do it earlier. There's a case pending because I was involved in it, but I'm not aware of one judge. But the issue, whether the issue is the converse of that or the reverse of that, can you not be held in bad faith for not attempting to settle when you recognize, if New York Marine closed someone with $750,000 authority to pay Ms. Redding that amount in 2011 and failed to do so, is that actionable under the facts of this case? And if it is actionable, then the predicate to Judge Lovell's ruling finding these people prosecuting this case in utter bad faith in 2014 fails and the sanctions have to be vacated. Delay got your client a chance to bring more clients into Sharon Park. No, my client didn't do that. My client only represented Ms. Redding. And again, it was not to his financial advantage the way this case turned out to bring in more clients. But the question is, Mrs. Redding arguably could have received $750,000 in 2011 rather than the $600,000 she received in 2012. Is it a great case? No. Is it one that totally lacks merit? No. And if there's any modicum of merit to that case, there's no reason to have sanctioned Mr. Talliff's client or my client in 2015. Thank you, Judge. I think I still have one more minute of morning. So good morning, Your Honors. Mark Goodman for Prosite Specialty Management Company, Prosite Specialty Insurance Company, and New York Marine and General Insurance Company. I'm here with my local counsel from Montana, Gary Zadig. My client was likewise flummoxed and confused by being sued for bad faith in this case, in the case below. That case is not before Your Honors, of course, because the district court found that there was no bad faith as a matter of law. And that matter is not on appeal. That appeal was filed but dismissed. The lack of merit in that case to me as a lawyer for the client was apparent from the get-go, which is why we brought a motion to dismiss on the pleadings, a Rule 12 motion, which the judge, Judge Lovell, was inclined to grant at the hearing. We had extensive oral argument on that motion, and the judge ultimately decided not to grant the motion because Ms. Diola represented to him that she had, she didn't believe, she had evidence that the insured consented or requested my client to pay policy limits to settle Ms. Redding's claim alone. So all of this discussion that we just heard about, the failure to settle Ms. Redding's claim, the key here was that the policy at issue, the insurance contracted issue, required consent of the insured, which Ms. Redding was suing at the time. Ms. Diola's client was suing the insured. The insured never consented to paying $750,000 or $2 million or anything else in that settlement, no specific figure. And we made that argument in the dismissal motion, and the court, in reliance on Ms. Diola's statement to the court that she had evidence to the contrary is what caused the case to continue. And the evidence to the contrary specifically being what? That's a good, you got me, Your Honor. I think what she was relying on was a letter from defense counsel for the insured, which said that, gave an analysis of the case, and gave a statement in there that they believe the case should settle for within policy limits. And I think that's what she was relying on, but there's no statement in that letter or from the insured itself, as opposed to defense counsel, saying, please pay policy limits to settle, to Ms. Redding alone, to settle these cases. Because these cases arose out of the DBSI scheme. Your Honor might be familiar, Your Honors might be familiar with that. There were a lot of cases arising out of this. So our insured, Anderson Zermulin, knew that this was not gonna be a one-off. There were gonna be multiple claims against it. It was never gonna agree to pay all of its available insurance to one party when it knew it was gonna be sued by other parties. And sure enough, it was right. It got sued by other parties. And Ms. Diola represented almost all of those parties. And it's untrue, and you can see from the record, she's the one who allocated all of the payment that was ultimately made to settle all of those cases. So here you have an insured with $4 million of total possible policy limits. And really, there was a very good argument that we had, that there was $2 million available because there was a relation back provision in our policies. So, but we paid the maximum amount to settle the maximum number of claims, all of them. And that's what Judge Lovell was faced with. Here's my problem with this case. Yes, sir. As I read Judge Lovell's orders, very long, it's quite articulate, it's even impassioned, and he's really unhappy with what he perceives to be the unethical conduct of Ms. Diola. That does not strike, in allocating the funds, not in litigating the bad faith case. So I just, I read his order and I say, you're mad at her for something that you see that she's done, whether you're correct or not, and that I'm not gonna get into for the moment. But I don't see what that has to do with the bad faith lawsuit. That's something that happened before, and it seems to me off to one side. I'm not saying you cannot, as a categorical matter, you can never consider pre-litigation conduct, but I don't see what this conduct has to do with the bad faith suit for which we're looking at the half a million dollars worth of sanctions. And I don't think it does. And I don't think, I think he references it in the order, Your Honor. Not only references it, he spends a long time talking about it. He does, Your Honor, and I think, but I think it is, gives context. I don't, there's no indication, Your Honor, that he sanctioned conduct before the litigation. He refers to pre-litigation conduct, which gives context to the vexatious motive here. Well, but if it's context, it's just dirtying her up. I mean, we're supposed to think, well, because she was a bad person then, according to Judge Lovell's conclusion, she's a bad person now. I don't think so, Your Honor. I don't think that's what the order is meant to do, and I don't think that's what it does. I think, as you know, the law here says that you can sanction an attorney for either doing something for an improper purpose or unreasonably multiplying the proceedings. And the improper purpose, I think, what that does is it gives context to the improper purpose. Because the fact that Ms. Diola did these things and allocated and didn't give her client enough money shows why she sued my client to try to get more money to cover up what she did to her client. But the the... Is that what Judge Lovell says? I think that's what is in his, I think that's why he's given the context, Your Honor. That's not what he said. I mean, you put two dots together that I don't think the judge puts together. I don't think, Your Honor, what's in his order is Ms. Diola is being sanctioned $500,000 for not allocating properly the money to her client. What he says is it became clear in this case, the bad faith case, during discovery, after the insured, Anderson Zermulin, in a corporate 30b-6 deposition testified that they never consented to payment of policy limits or any other specific amount for settlement of the claim. That is what I think really got him, because that's what Ms. Diola said she could show during the 12b motion. So once that happened, there was no basis. I said at the beginning of my argument this morning, and I said it four years ago or five years ago, that there was no, she didn't have any evidence. Well, certainly after Anderson Zermulin testified that there was no evidence, that was the end of the case. And that's what Judge Lovell really focused on. That's the conduct that he focused on. And after that, that's the point in time after which he found that... That's the but for, Your Honor, exactly. If they had said, and there has to be accountability. That's why we have these rules. That's why we have 1927 and Rule 11 and the Court's inherent authority to sanction lawyers who have to be responsible to the Court and to their opposing parties to bring meritorious claims, claims that have a basis. And I think Judge Lovell could have gone much further back in time for sanctions, but he picked the latest point in time when it was absolutely clear. You have the thing that Ms. Dula said she existed, and you have from the horse's mouth it didn't exist. That should have been the end of the story. But witnesses lie sometimes. Your Honor, there's no indication that the witness lied. There's no impetus for this witness to lie. It was a corporate designee who testified. The lawyer who wrote the letter that I referenced also said he never received any instruction from his client to settle for policy limits or any specific amount, and he never said intended for his letter to say that. He said that if he wanted to say that to pay a specific amount, he would have said that, and he didn't. So it's not just one isolated incident of some one witness saying something that puts a dent in their case. It was the nail in the coffin, literally. There was no evidence to begin with, and all of the discovery confirmed what we had said from the beginning. So not only was there no evidence supporting what Ms. Dula said to the Court, the evidence was directly to the contrary. And that's what I think Judge Lovell focuses on, really focuses on, and that's what he's sanctioning. Otherwise, he would have pushed the sanctions way back to the beginning of the case or pre-case somehow. That's not what happened, of course. What he's focusing on in the order, and I agree with Your Honor, there is a lot of focus on the pre-litigation conduct. But again, I think that has to be because it wasn't what he sanctioned them for. He sanctioned them for you brought a claim without any evidence, and then you found out that there was – it was confirmed, and you kept going. And it was the keeping going that he really sanctioned them for, not as far as – again, as far as I'm concerned, what could have been pushed back in time. I see a lot of lawyers pursuing claims long past the time when it's obvious they're no damn good, and I don't see sanctions coming out of it. Well, Your Honor, my personal view on that is that's a shame because there – I think there needs to be a lot more accountability. That's because you represent defendants. Well, not always, Your Honor. And I've pursued – and when I do represent defendants, I also bring cross-claims and I have affirmative defenses. And I understand my responsibility in pursuing those cross-claims and asserting those affirmative defenses that if I don't have the evidence to support them, I have to get rid of them. I have to drop them. And that's something that I think is really important. We have to be accountable as lawyers to the system. Otherwise, it's – all of this – it's not a victimless crime. This trickles down to all of us as consumers of products when the idea is, well, we'll just sue companies and we'll – we'll just walk away at the end of the day. If we lose, we lose. But, you know, so they had to spend millions of dollars to defend themselves against our frivolous claims. You have to be held responsible. I assume – I assume that you believe that the district court's summary judgment order was sufficient to put the other side on notice of the grounds on which sanctions could be levied. That, among other things, Your Honor, yes. And just tell me why. Why do you think it was sufficient? The order itself? Yes. Because in 104 pages, it lays out exactly what – where the shortcomings were in the evidence. And it talks about, as I just described, the fact that Ms. Diola told the Court that she was going to be able to show that the insured consented to a settlement of $2 million, and there was undisputed evidence that that wasn't the case, that the insured did not consent to such a payment. There was also – the order is long, and carefully – it's one of the longest orders I've seen in my 26 years of practicing, where he sets out the whole history of the case. And there's also in – as Your Honor knows, in this record, other than the 104-page order, there was the motions to dismiss that we brought, the letters that we wrote to counsel saying, you don't have any evidence, tell us what evidence you're relying on. And we did that after the lawyers were deposed and they said they hadn't been given instructions by their client to pay any amount of money in settlement, and we wrote two separate letters saying, you've got to tell us what the evidence is, because you don't have any, and if you don't, if you continue this, we're going to seek out conversations at hearings where I said, you know, my client is not an ATM machine, it's not an endless supply of funds, or we can just keep this case going. Ms. Diola has to come up with a basis for her claims. And the judge says, I'm very cognizant of that. And then we brought a motion – this was not a sua sponte motion for sanctions. We brought a Rule 54 motion for fees and costs and laid out all of the grounds in there. They opposed that motion. They asked for additional time. They got it. They never asked for an oral argument. Every time they asked for oral argument in this case, they got it. They did not ask for oral argument on the sanctions motion. So the idea that their arguments were not heard, of course their arguments were heard. They had a full briefing and multiple affidavits. They're saying that they would call witnesses. What witnesses? They had affidavits that they gave to the Court. The Court considered everything that they said in their opposition. And that's what they're saying in their papers here, and it's what they just told Your Honors today. So there's nothing that they've identified as far as a specific fact that they would have been able to put forward. Discovery was completed. A summary judgment motion had been granted. There was nothing left of this case. So there was no further evidence that they could have brought forward. Yet they still brought forward affidavits and made arguments. And in none of their several filings with this Court and in 20 minutes or almost 20 minutes of argument, have they identified any fact that would have given that they were not able to present. So I think there was a question as to something that Mr. Judge didn't. I think the point they were making is that bad faith requires a subjective finding, and that they were entitled to present their own evidence on the point. The lawyers were entitled to, say, explain lack of bad faith. Yes, Justice Gazzetti. And I'm saying they did present that evidence. They had affidavits that they presented. They were put on notice of that. They presented. There's no indication that they did not put forth any such evidence. They did. They had affidavits. It was like 300 pages of material that they submitted to Judge Lovell that he considered on the motion. So there was such evidence. And there was a significant record before the Court with respect to subjective bad faith. And I would say to Your Honor that it's subjective bad faith or a frivolous, releasing frivolous arguments that multiply the proceedings. That, I think, is another thing that Judge Lovell focused on with respect to this point in time after which it was not possible for them to, in good faith, continue to litigate this case. Again, while I think it could have gone before the Intersen-Zermulin 30b-6 deposition testimony on Valentine's Day in 2014 where they said, that's, no, we never agreed or consented to a settlement, I think it could have gone, there was plenty of evidence before that. And Judge Lovell didn't go there. He said, this is the point in time when it was absolutely 100 percent clear that your claims were no good and you didn't say, okay, we're walking away. We don't have the evidence that I thought we had. Oops, my bad. That would have been, we would have kicked and screamed. We still would have brought a motion, but he wouldn't have granted it, evidently, because he didn't find that anything before that date would have, would have been sanctionable. But at the point in time where they didn't do that and they had the letters and they had the motions and they had the evidence and they had all these things, then they had, the evidence is there, Your Honor, and they, they made the points that they wanted to make. And they were given the opportunity to do that and they did it. They didn't say, hey, give us a hearing, because there's no indication that Judge Lovell wouldn't have given them a hearing if they had said that. There's, and their cases don't support the idea that sanctions cannot be granted without hearing, without oral argument. What amount of sanctions? It seems quite heavy. I've seen sanctions amount before, but this is on the high side, maybe the highest I've ever seen. Well, it's certainly not the highest I've ever seen, and it's... You're from New York? San Francisco. Same place. I'm a native San Franciscan. I don't... It's not Kalispell. It's not Kalispell. It's not Bozeman. No, but this is not a judge who just, you know, came in on the bench. He's a senior judge. He's seen a lot of litigation. He found that the rates and the amounts that were charged were, from the point forward, were reasonable. We obviously asked for a lot more when we asked for the sanctions. He granted only a fraction of what we asked for. So I hate putting on the record that my fees are high, so I won't. But the... This is a court... Again, Your Honor, this is something that's within the sound discretion of the district court to decide, and unless there's a clear error or abuse, I think the fact that this was an expensive case. They made us do a lot of work. My rate to this client is heavily discounted from my standard rate, so it's a matter of record here that the judge took into account all of that evidence. It compared favorably to other work in Helena for this type of work by national and international law firms. So the amount that was awarded, I think there's no evidence that it was somehow excessive, even though, by itself, $500,000, of course, is a lot of money. But it's not... The amount that was actually incurred was several times that, at least one... Did the judge make his findings based on clear and convincing evidence, or isn't it clear from the record? He doesn't... I don't think he uses the phrase clear and convincing, but I don't think a lot of judges on the district court level use that phrase, as far as finding it based on clear and convincing. I think it was clear from the evidence that he looked at in the record and the findings that he made that it was based on clear and convincing. Do you think he was required to make the finding by clear and convincing evidence, or is that not the standard that he had to use? Well, I think, with respect to the bad faith finding, it had to be on clear and convincing. I don't think he had to utter the words, making this finding on clear and convincing evidence. But I think the evidence had to be clear and convincing. And I think, again, the... If you look at what he based the sanctions on, which is the circumstances of the case, the fact that you have an insurance company that paid out its full that this is a lawsuit brought by a third party, and there was a statement made that, here's what I'm relying on by the plaintiff, and that statement was proven to be false, or at least entirely inaccurate, that's pretty clear and convincing. I think that meets the standard, whether the court actually used that phrase in its order or not, it meets the standard. There's not... When you're looking at it, obviously you're looking at it for a breeze of discretion and clear error. I think it would be clear error if there was a finding by you that there was certainly not clear and convincing evidence, but I don't think you can make that finding based on the record in front of you. Thank you. Thank you very much. I believe we have some time for rebuttal. Thank you, Your Honor. With regard to the motion for judgment on the pleadings, the record will show that what was alleged in the complaint was that the insurance company didn't respond to the demand letter, and that it was the recommendation of the accountant's lawyers to settle the case. So, nothing in... What about the consent of the insured? The consent of the insurer, again, under our statute in case law, is immaterial to the insurer's obligation to investigate and respond and explain. And that was the crux of the case. As Mr. Davis said, trying to lay this on whether the insured consented or not is the wrong standard. So, at the time that that hearing was held... I'm sorry, what was the prejudice for you? They didn't give an explanation? I understood the claim, oh, they could have gotten more if they had settled then. That I understand. But they didn't give an explanation? That's a lawsuit? Well, it's a basis for a lawsuit. It's a question of what the damages ultimately would be, Your Honor. And there is a case in Montana. I'm sorry, I can't give the full name of the site. It's Shilhannik, S-H-I-L-A-N-E-K, I believe, where an insured did bring a bad face suit after the insurance company had paid. That's my recollection. Had paid the policy limits? I don't know if it was policy limits. I think so, but I don't want to mistake. It becomes irrelevant if it's not the policy limits. Well, it isn't that they ultimately paid policy limits that becomes a relevant question or fact. It's whether they did it at the time they were required to do so. And it may be a factor in determining what the damages are, but it doesn't absolve them because they ultimately... Your Honor, I'm not even talking about paying. You're saying you seem to concede they couldn't have paid it without the consent of the insured. No, I'm sorry to interrupt you. I'm not conceding that. I'm saying the insured can't unreasonably withhold consent. And if they tried to, there's a hammer clause in the insurance policy that said New York Marine could pay the policy limits, would no longer have an obligation or duty to defend or pay out any more money. What does the hammer clause say? It says if we want to settle and you refuse, you withhold consent unreasonably, we have no further obligation. There's no reason we're not saying, look, I know there's going to be other lawsuits. We don't want you to blow the entire amount on one plaintiff. Don't pay it out because we expect to have other issues. People file claims. What's your opinion about that? Well, that situation didn't exist in March and February of 2011 when the demand came in. There weren't any other claimants. Yeah, but they knew there were some coming because they knew the advice they'd given, which was quite consistently, you sell your ranch, you invest in this other property. They knew the advice they'd given. They knew the lawsuits that were coming. I agree with that. I'm saying there were no claims made, but they thought there were other potential claimants out there. Yeah, yeah. Okay. But if that was the case, then they could have filed a deck action. They could have interpleaded the funds and said, we don't know how this should be divvied up. But instead, they only had one claimant who made a claim, and they didn't base their failure to respond to Billy Redding on the fact that there might be other claimants. They said two things, and the only response they gave, which was there might be a statute of limitations defense, and there might be a defense based on the fact that some of these tenancies in common involve non-recourse debt, so it might have affected the damages that Redding had. But they never explored either of those grounds and never pursued them, never made a motion on those grounds. But my point regarding the motion for judgment on the pleadings is that at that time, Ms. Diola had filed with the court letters and other documents that she believed and I think can be reasonably interpreted to support the statement that she made. But at worst, it's a misstatement, but it's also evidence that the judge had at the time, and his ruling on that motion didn't depend at all on what she said at that hearing about policy limits. Thank you. Thank you, Your Honor. Thank you very much. Keisha Sawyer with Tenant Submitted. We are adjourned.
judges: Kozinski, W. Fletcher, Tunheim